**STATE OF TEXAS v. GROUP OF INSTI-
TUTIONAL INVESTORS et al.**

**MISSOURI PAC. R. CO. et al. v. GROUP
OF INSTITUTIONAL INVESTORS
et al.**

Nos. 14256, 14264–14274.

United States Court of Appeals
Eighth Circuit.

Aug. 14, 1951.

266

---

C. K. Richards, Asst. Atty. Gen., of Texas (Price Daniel, Atty. Gen. of Texas, with him on the brief), for the State of Texas, intervener.

Marion B. Pierce, New York City (Oliver & Oliver, Cape Girardeau, Mo., with him on the brief), for Missouri Pac. R. Co., debtor.

Helen Munsert, Chicago, Ill., for Protective Committee for Holders of Common Stock of Missouri Pac. R. Co.

Adrian L. Foley, New York City (Edmund O'Hare, New York City, with him on the brief), for Alleghany Corp.

Lucien Hilmer, New York City, for John V. Farwell III and others, Independent Directors of Missouri Pac. R. Co.

Carl H. McClure III, New York City, and Forest P. Tralles, St. Louis, Mo. (Carroll C. Gilpin, St. Louis, Mo., Edward B. Twombly, New York City, DeLancey C. Smith, San Francisco, Cal., Willard P. Scott, Joseph W. Keena, Tralles, Hoffmeister & Gilpin, Putney, Twombly, Hall & Skidmore, St. Louis, Mo., Oliver & Donnally, New York City, with them on the brief), for Protective Committee for Holders of Missouri Pac. R. Co. 5¼% Secured Serial Gold Bonds, etc., and others.

Emmet McCaffery, Washington, D. C. (Emmet Carter, St. Louis, Mo., Dorr, Hand & Dawson, New York City, Carter, Bull & McNulty, St. Louis, Mo., with him on the brief), for Chemical Bank & Trust Co., as trustee.

William H. Biggs, St. Louis, Mo., for Missouri Pac. R. Co. 5¼% Secured Serial Bondholders Committee.

Harry Kirshbaum, New York City (Edwin J. Bean, St. Louis, Mo., with him on the brief), for Gerald Axelrod and others.

Harry W. Harrison and Robert E. Smith, New York City, filed brief for Protective Committee for Holders of Preferred Stock of Missouri Pacific Railroad Co.

Charles W. McConaughy, New York City (Jacob Chasnoff, St. Louis, Mo., Morris D. Crawford, Jr., Cadwalader, Wickersham & Taft, New York City, Lowenhaupt, Waite, Chasnoff & Stolar, St. Louis, Mo., with him on the brief), for Group of Institutional Investors.

Sanford H. E. Freund, New York City (Shearman & Sterling & Wright, New York City, with him on the brief), for Protective Committee for Holders of General Mortgage Bonds of Missouri Pac. R. Co.

Leonard P. Moore, New York City (Clair B. Hughes, Alan S. Kuller, Chadbourne, Parke, Whiteside, Wolff & Brophy, New York City, with him on the brief), for Manufacturers Trust Co., as corporate trustee.

Kenneth McEwen, New York City (Everett Paul Griffin, St. Louis, Mo., Edward F. Colladay, Washington, D. C., with him on the brief), for Edmund Wright, and others.

Harry Kirshbaum, New York City, Edwin J. Bean, St. Louis, Mo., filed briefs for Convertible Bondholders Group, owners and holders.

William P. Palmer, Root, Ballantine, Harlan, Bushby & Palmer, New York City, filed brief for Bankers Trust Co., as successor trustee.

Before WOODROUGH, THOMAS, and JOHNSEN, Circuit Judges.

WOODROUGH, Circuit Judge.

On October 3, 1950, the District Court entered its Order No. 3571 In the Matter of Missouri Pacific Railroad Company, Debtor, in Proceedings for Reorganization of a Railroad, whereby upon hearing and consideration the court overruled all objections against and approved the system Plan of Reorganization for Missouri Pacific Railroad Company, Debtor, and its subsidiary railroads, all of which had filed petitions as debtors in the same proceedings, declaring themselves to be unable to meet their debts and desiring to effect a plan of reorganization pursuant to Section 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, in connection with, or as a part of, the plan of reorganization of said Missouri Pacific Railroad Company. The system Plan of Reorganization so approved was submitted by the Interstate Commerce Commission on August 2, 1949, in its Fourth Supplemental Report, and after further hearing in its Fifth Supplemental Report and Order of December 29, 1949. The reports and the order of the Commission appear in full in Volume LII of the Missouri Pacific Reorganization proceedings. The District Court accompanied its order No. 3571, affirming and approving the system Plan of Reorganization, with its comprehensive opinion in writing, reported in 93 F.Supp. 832, in which it referred to its previous opinions concerning earlier plans of reorganization of the same railroads, reported in 39 F. Supp. 436, in 50 F.Supp. 936, and in 64 F. Supp. 64. Its opinions set forth the relations of the Missouri Pacific to its subsidiaries, the course of the reorganization proceedings and the questions, contentions and rulings.

The appellants in all these appeals are contending here that the court erred in entering its Order No. 3571 approving the Plan of Reorganization of 1949, and all seek reversal or modification of such approval. The appellants in two of the appeals, No. 14,273 and No. 14,274, respectively, also seek reversal of Orders No. 3661 and No. 3662, entered by the District Court in the same proceedings on the same date of October 3, 1950. By Order No. 3661, a petition for treatment of the subsidiary debtor New Orleans, Texas and Mexico Railway Company differing from that provided by the plan was dismissed. By Order No. 3662, the petition of persons designating themselves "Independent Directors" of the Missouri Pacific, seeking action by the court in respect to the debtors at variance with the Plan, was dismissed. The part of the opinion of the District Court on pages 856 to 862 of 93 F.Supp. is directed to its Order No. 3661, and pages 862 to the end of the opinion cover its Order No. 3662.

The Plan provides for a new system capitalization for all the debtors not to exceed approximately $612,000,000, made up by ascribing $509,700,000 permissible valuation to Missouri Pacific; $83,700,000 to New Orleans, and $57,000,000 to International-Great Northern, and cancelling out certain inter-company debts. There results an equity of some $30,000,000 for the preferred stockholders of Missouri Pacific recognized in the distribution by allowing 3 shares of proposed new Class B common stock for each 7 shares of the present preferred.

But the common stockholders of that company are eliminated. As to such common stockholders, the court specifically approved the finding of the Commission that "the equity of the holders of common stock is without value". A simplified capital structure is prescribed for the system, consisting of only three classes of indebtedness: (1) equipment obligations, (2) first mortgage bonds, and (3) general mortgage bonds. There are three classes of capital stock—preferred, no-par common stock class A and class B. The distribution is shown on the table Appendix D at page 855 of 93 F.Supp. in the District Court's opinion.

We approach review of the orders here appealed from by noting the classes of parties in interest who have prosecuted the appeals and observe at the outset that, although the Plan that has been approved and is for review here includes provisions affecting the securities of numerous classes of creditors of the debtor and subsidiary debtors involving very large property rights as is fully shown in the table Appendix D, there is only one class of creditors appealing and objecting to the allocations and basic structure of the Plan. It is unlikely that all the other creditors are entirely satisfied with it as the claims of only one of the classes, the New Orleans First Mortgage Bonds, are to be satisfied in full in cash or its equivalent. All the rest must submit to substantial adjustments. But with the one exception they have all acquiesced in the valuations and the allocations. None of the preceding plans of reorganization received such general measure of acceptance by creditors.

The one class of creditors so objecting and appealing comprises the owners of the bonds issued by the debtor designated in the table Secured Serial 5¼ Bonds which were issued by Missouri Pacific and secured by pledge of about 82 per cent of the capital stock of the subsidiary debtor, the New Orleans company. Those who speak for this class of creditors join in contentions made for the late Mr. John Speed Elliott and with others owning some of the Serial bonds and owning and speaking for owners of some unpledged publicly owned shares of such capital stock. They object to the treatment accorded by the Plan to the New Orleans capital stock in that they claim the Commission valued that stock too low and allocated insufficient securities of the new company in respect of it.

The Missouri Pacific bought all but a small per cent of the capital stock of the New Orleans pursuant to authority granted by the Interstate Commerce Commission in 1924, after investigation and determination that the purchase was in the public interest (Control of Gulf Coast Lines by M.P.R.R., 94 I.C.C. 191), and the Gulf Coast Lines have been operated as part of the system ever since though retaining their separate corporate structures. In purchasing the stock the Missouri Pacific originally issued its 7% Sinking Fund Notes and in 1926 it issued the 5¼% Secured Serial Bonds to take up the notes. $13,156,000 of these bonds were issued to public investors, and 131,560 shares of the stock or ten shares for each $1,000 bond were pledged as security. At bankruptcy $12,140,000 of the Serials were publicly outstanding secured by the pledge of 121,460 [or 121,400] shares (82%) of the stock. The Trustee in Reorganization bought up some of the bonds during the proceedings so that at present only $10,425,000 of them are publicly outstanding. With interest, they amount at the Plan's effective date, January 1, 1948, to $18,680,297.

The holders of the Serial bonds secured by the stock and the owners of the unpledged stock have been accorded a posi-

tion in the Plan which the Commission thought was far superior to that of any other junior interest. The allocation for the bonds was $16,867,500 of new General Mortgage Income Bonds; $3,282,078 of new Preferred Stock, and 28,112.5 shares of new Common Stock Class A. For the stock the allocation was $1,289,700 of new General Mortgage Income Bonds and $214,950 in shares of new Common Stock Class A. About 60% of the Missouri Pacific share of the new System capitalization will be represented by funded debt securities and about 40% by stock, but the entire New Orleans share of the new System capitalization will be represented by funded debt securities except for something over $3,000,000 of new Class A common stock. The Commission determined that each share of New Orleans stock represented $150 of New Orleans capitalization but the New Orleans stockholders and the Serial bonds were not limited to $150 in new securities allocated to them. Both were allocated in addition $25 par value of the new Common Stock Class A in respect of each share of New Orleans stock, making a total of $175 in the new system capitalization. They were also preferred over general creditors of Missouri Pacific and second mortgage creditors of International by an allocation entirely in new preferred stock in recognition of the control which the pledged New Orleans stock carries. According to market report of July 25, 1950, the market value of securities allocated under the Plan in respect of the New Orleans capitalization was 18.48% of the market value of all of the new securities issuable under the Plan. For the period April 1, 1950 to March 31, 1951, computations show that New Orleans contributed only 12% of System earnings available for interest, but the market value of the securities allocable in respect of its capitalization was 17.65% of the total market value of all the new securities under the Plan.

But at the hearing on the Plan evidence and briefs were submitted in support of the contention that the earnings of the New Orleans in certain periods have been and in the future promise to be so large that the Commission was required to find a much greater value for its stock than was found, and that the valuation and resultant allocation of the Plan as reported was inadequate and confiscatory of the property of the holders of Serial bonds and N.O.T.M. stock. Theirs are the most elaborated and extended arguments on the appeals.

All of the other appellants here, including the Debtor, are aligned either with those who having sufficient interest object to the treatment given in the Plan to the common stock of Missouri Pacific or to the preferred stock, or they are appellants who do not object to the allocation of new securities under the Plan but do object to incidental effects of the Plan. Thus Texas complains that the consolidation of the properties of the Debtors as provided by the Plan will violate the constitution and laws of that state and "Independent Directors" contend that the System feature of the Plan is unlawful. With a few exceptions, all appellants complain that they were erroneously denied representation to which they were entitled in the selection of reorganization managers and members of the Board of Directors of the new company.

The contentions which are presented in support of the appeals are specified in something over two hundred points but the objections to the plan out of which they arise were classified by the trial court in its principal opinion for discussion and disposition into the following categories which suffice to identify them for our review: Objections to valuation and capitalization; Objections to allocation; Objections to consolidation of the debtors; Miscellaneous objections. The trial court's ancillary opinions, pages 856 to 862, and 862 to end (93 F.Supp.) identify the issues which were determined by orders numbered 3661 and 3662 from which separate appeals have been taken. The matters they treat of that are material here are included in the "categories" of the main opinion.

(1)

We consider first the objections to the consolidation of the debtors in the reorganization into one system because it is clear beyond necessity for discussion that the validity of Order No. 3571, approving the

Plan, is dependent, on the legality of that feature of it. The record shows, as stated by the trial court, that "the Plan contemplates the reorganization of these companies as a single new System company, with a provision for the separate reorganization of the I.-G.N. [International-Great Northern] if that should be necessary", and the power of the Commission and legality of its action in prescribing such a plan in its reports and order were put in issue and were fully considered and sustained by the Commission and subsequently by the trial court. The court declared, "the Commission has the statutory power to require a merger or consolidation of affiliated railroads under Section 77 [77(b)(5)] of the Bankruptcy Act [1] when all of the railroads consolidated are before the Commission as debtors seeking reorganization, and that in such a case the Commission is not required to follow the provisions of the Interstate Commerce Act".[2] [93 F.Supp. 832, 852.]

■ Undoubtedly the duty to determine what corporation or corporations should own and operate the properties of the debtors on consummation of the reorganization was imposed on the Commission by section 77, sub. b(5). It was for the Commission to decide upon the form of organization capable of serving the public and of according their private rights to the owners affected. Congress has entrusted those matters to the Commission because of its special qualifications. Ecker v. Western Pacific R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892; Seaboard Air Line R. Co. v. Daniel, 333 U.S. 118, 68 S. Ct. 426, 92 L.Ed. 580. The Commission has re-affirmed its findings made in 1940 and 1944 that a System reorganization and consolidation of the properties of the Debtors will "result in economy of operation", "is in the public interest" and "will be of advantage to all debtors" and the trial court

concluded on full consideration that the findings were supported by material and substantial evidence.

The record affords no sound basis to assert that such findings of the Commission and conclusions of the court were not so supported. Thoroughly qualified expert witnesses established that the System organization will effect substantial economy of operation and that it will strengthen and give security to the financial status of all the debtors. It was also shown by such testimony that the public interest was substantially advanced by the unification of ownership and operations. The elimination of conflicts as to rights and duties of the respective railroads in relation to the public and as between themselves is thereby effected and is in the public interest. There was convincing evidence that substantial damage to both Missouri Pacific and to New Orleans would result from taking New Orleans out of the System.

■ The "Independent Directors" in their appeal No. 14,271, and the State of Texas in its separate appeal No. 14,256, have elaborated contentions that the System feature of the Plan is unlawful, and the State of Texas stresses particularly that by reason of that feature the Plan is brought in conflict with the constitution and laws of Texas and is therefore illegal. But as learned counsel conceded in argument, the federal power in bankruptcy is dominant over State power within that field, and the orders of the Interstate Commerce Commission which have been approved by the court and are in question here simply constitute an exercise of that federal power conferred upon the Commission by federal statute in plain terms and the requirements of the statute were duly complied with by the Commission. As the Supreme Court said, in Callaway v. Benton, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553, where it reasserted the power of the

1. 11 U.S.C.A. § 205, sub. b (5) "A plan of reorganization within the meaning of this section * * * (5) shall provide adequate means for the execution of the plan, which may include the transfer of any interest in or control of all or any part of the property of the debtor to

another corporation or corporations, the merger or consolidation of the debtor with another corporation or corporations * * *".

2. 49 U.S.C.A. § 5, subsection (2) (b) (c) and (f).

Interstate Commerce Commission to override state laws claimed to stand in the way of otherwise lawful plans of reorganization: "Nor is the ambit of federal power less broad in cases arising under the bankruptcy laws of the United States. Section 77, sub. f of the Bankruptcy Act specifically provides that the plan of reorganization shall be put into effect, 'the laws of any State or the decision or order of any State authority to the contrary notwithstanding.'" 336 U.S. at page 141, 69 S.Ct. at page 441.

■ The District Court was not in error in refusing to upset the System Plan by reason of want of power in the Commission to provide for the System reorganization or by reason of the local laws asserted against it. There is no occasion for this court to add to what the Commission in its report and the District Court in its opinion have said in support of the legality and propriety of those provisions of the Plan prescribing a System reorganization. It is clear from the record that the Commission asserted the power to order a System reorganization throughout these proceedings to the knowledge of Congress[3] and we think the following cases sustain the power of the Commission to order System Reorganization as it has done here. Seaboard Air Line R. Co. v. Daniel, supra; In re Chicago, Rock Island & Pac. Ry. Co., 7 Cir., 1948, 168 F. 2d 587, certiorari denied sub. nom. Texas v. Brown, 335 U.S. 855, 69 S.Ct. 82, 93 L. Ed. 402; Callaway v. Benton, 336 U.S. 132, 69 S.Ct. 435, 93 L.Ed. 553; Schwabacher v. United States, 334 U.S. 182, 68 S.Ct. 958, 92 L.Ed. 1305. See also In re New York, New Haven & Hartford Co., 2 Cir., 1945, 147 F.2d 40; Commission of Dept. of Public Utilities v. New York, New Haven & Hartford R. Co., 2 Cir., 178 F.2d 559; Palmer v. Massachusetts, 308 U.S. 79, 60 S.Ct. 34, 84 L.Ed. 93; In re Florida East Coast Ry. Co., D.C., 81 F.Supp. 926, affirmed Atlantic Coast Line R. Co. v. St. Joe Paper Co., 5 Cir., 179 F.2d 538.

Nor do we find any merit in the contention that the New Orleans could not be included in the System reorganization either because of its alleged solvency or because the inclusion of it in the System is unfair to the holders of New Orleans capital stock. It was adjudicated in a former stage of the proceedings that the New Orleans is indebted to the Missouri Pacific on interest bearing promissory notes payable on demand in an aggregate amount now approaching $20,000,000 and its total indebtedness amounts to more than 80% of its capitalization. It came into the proceedings by its petition alleging its inability to pay its debts and it is not proven to be in position now to pay or to refund its debts. The Commission, upon full consideration, was convinced that the obligations of the New Orleans could be properly rearranged only by a reorganization and, if separately reorganized as urged by a very small minority of parties in interest here, only by extensive modification of its capital structure. If fair compensation was made for the bonds secured by the stock and for the stock itself the approval of the inclusion of New Orleans in the System was not erroneous.

All the objections against the System provisions of the Plan as such were properly overruled by the court.

### (2) Valuation and Capitalization.

In fixing the new capitalization of the System at not to exceed $612,000,000, the Commission raised the valuation about $52,-000,000 above the amount fixed in the 1940 and 1944 plans. It devoted some 63 pages tailed discussion of the elements which it considered in arriving at the new capitalization and a large portion of its Fifth Supplemental Report, issued after consideration of substantially the same contentions against the Commission action which were urged upon the trial court and are now before this court, is also devoted to answering the contentions and reasserting the Commission's deliberate and informed determination of the new valuation and capitalization.

The reports show that in determining the new capitalization the Commission gave consideration to (1) past, present and prospective earnings of the System and of the

3. Senate Report No. 1170, Calendar No. 1190, 79th Cong., 2nd Sess., pp. 80, 85.

component debtors, and (2) elements of physical value as reported by its Bureau of Valuation and as developed at the hearings, including original cost, cost of reproduction new, cost of reproduction new less depreciation, value of land and rights, allowances for working capital, investments and cash resources. It stated in summarizing that its findings were made "upon consideration of the entire record."

Most of the appellants contend that the maximum permissible capitalization of the Debtors determined by the Commission is too low. The only class of creditors who have appealed contend that the record supports valuations for the New Orleans company ranging from $104,444,444 to $143,000,000, and that "the principal issue arises from the value [$83,700,000] placed [by the Commission] upon the stock of New Orleans". They insist that the earning power of New Orleans should be the sole measure of capitalization for that company and argue that the Commission undervalued the earning power and used certain elements of physical value to place an arbitrary limitation on New Orleans capitalization.

The appellants concerned for the common and for the preferred stock of Missouri Pacific, on the other hand, contend that the Commission erroneously failed to ascribe due weight to reproduction cost less depreciation and to the constitutional right of the debtors to earn reasonable returns thereon. They also contend that the evidence as to the earning power and the other elements of value of the debtors shown in evidence justified and required valuations for the system ranging many millions higher than found by the Commission.

The complaint of appellants that the Commission underrated the earning power of the Debtors and that the court, notwithstanding additional evidence on that issue, also made the same error as to such earning power has been rested mainly on the evidence that activities productive of railroad business have increased in the territory and that such increase, together with increase of population, will continue; that betterments in equipment will reduce costs, and that the debtors were shown to have had large earnings available for interest in

certain periods, including some of the post-war years, the year of the effective date of the Plan and subsequent years. Some expert testimony was also adduced to the effect that the high earnings are reasonably to be anticipated in the future and that the low earnings of other periods are irrelevant. The Commission has adhered to its determination that the periods of low earnings are also relevant. It recalled periods of small earnings for each of the companies and that in 1938, 1939 and 1940 the New Orleans incurred deficits in net income. It adjusted its estimate of earning power upwards on consideration of the evidence submitted after the Plan was sent back to it the last time, but refused to disregard the experience of the years of lower returns and the factors that may cause their recurrence. The gist of appellants' complaint in respect to the estimates of earning power is that the Commission has drawn pessimistic inferences from the evidence as to such earning power and more sanguine estimates were required.

■ But the Commission's reports show that it had all the evidence relevant to the question of earning power before it, that it gave consideration to all elements proper to be considered and that its estimate of earning power was not arbitrarily arrived at. It was supported by substantial evidence and as found by the trial court there were no permanent and substantial changes not anticipated by the Commission. We find the Commission's estimates of earning power supported by credible evidence.

■ In respect to the elements of physical value which were taken into account by the Commission in attributing a permissible capitalization of $83,700,000 to the New Orleans, it is contended for the appellants interested in the New Orleans capital stock that the Commission erroneously based its finding as to the capitalizable value of the company on physical values instead of on its earning power and thereby wrongfully placed an arbitrary limit on the value to the prejudice of the Serial bondholders and the stockholders. The contention is elaborated and pressed with earnestness, but we think it is not supported by the record, and it is not sustained. In fixing the capitalization

for the new System company, it was the Commission's function to conform the capitalization to the requirements of the public interest as well as to accord fair treatment to private interests. To protect the private rights of the appellants the new capitalization must permit the satisfaction of all claims in respect of the New Orleans stock to the full extent of its value measured by earning capacity. Ecker v. Western Pacific R. Corp., supra, and Group of Institutional Investors v. Chicago, Milwaukee, St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L. Ed. 959. But a prime consideration in the Reorganization was to reduce the excessive capitalization where such excess was shown and to confine it to the aggregate of capitalizable assets. The Commission was convinced that the New Orleans did not have a value in excess of $83,700,000. It also considered that it would not be in the public interest to declare a capitalization for New Orleans at a dollar amount in excess of both physical value and the investment in transportation properties as shown by the balance sheet of the New Orleans. But the Commission did not fail to give full consideration to the earning power of the New Orleans as such earning power was found by it. When it came to provide for the compensation to be awarded in respect of the New Orleans stock it made its allocations on the basis of the full value of the stock. No one interested in that stock was in any wise prejudiced by the permissible dollar valuation of the New Orleans company for the System capitalization. The Commission undertook to fully compensate those interested in that stock in the allocations it made in respect thereof.

It gave full consideration to the earning power of the New Orleans and was satisfied and found that the securities which it allocated in respect of the assets of the New Orleans were "adequate to compensate the security holders of the New Orleans for their contribution valued on the basis of earnings". Also that: "The system capitalization and allocation of system securities herein approved by us reflects any additional earning power of the New Orleans for which the system should compensate the New Orleans security holders." And in considering its allocation to the Serial bondholders in respect of the pledged capital stock of the New Orleans, the Commission reiterated: "We further find that such allocation of new securities with respect to the New Orleans common stock recognizes the proportionate contribution of earnings which may reasonably be expected to be made by the New Orleans to the reorganized system company with which it is required to consolidate pursuant to the terms of the modified plan approved herein and will constitute the full equivalent of the value of the New Orleans stock."

The allocations are discussed later, but it is clear that there was no error prejudicial to those interested in New Orleans stock in the permissible valuation of New Orleans for Reorganization at $83,700,000 found by the Commission.

When we turn to the contentions of the appellants who are concerned for the common stock of the Missouri Pacific we do not find that they have pointed out any reversible error in the refusal of the Commission to find a valuation sufficient to provide an equity in the common stock. The record shows and the court found that the Commission in arriving at its valuation and maximum capitalization which eliminates the common stock gave due consideration to all elements proper to be taken into account in the process, including earnings and physical values, and after reaching and announcing its conclusions, it heard and answered the objections urged against them. The arguments made to the District court and now urged on the appeals amount simply to expression of appellants' disagreement with the Commission and the Bureau of Valuation in the determination of values. We do not find any specified instance of disregard of legal standards on the part of the Commission which appears to us to merit discussion. The action of the Commission in determining the reorganization value was taken in the field where its conclusions are binding. Whether or not there was an equity in the common stock was for the Commission and the trial court did not err in approving its action.

As of January 1, 1951, there were $282,045,385 of arrears in interest on the Mis-

souri Pacific claims and dividends on the old Missouri Pacific Preferred stock. The old common stock has not received a dividend since the company came out of the reorganization in 1917. There is no sound basis for a finding that the common stock has value or that the equity allotted to the preferred stock was greater than found by the Commission and approved by the court.

We think that the trial court in its opinion sufficiently disclosed the course of the testimony and answered the contentions against the amount of the System valuation and capitalization fixed by the Commission and that the court's approval of the Commission's action was without error.

### (3) Allocations.

The objections against the allocations of securities urged by appellants holding the Serial bonds secured by pledge of New Orleans stock and owners of unpledged New Orleans stock are considered in the opinion of the trial court under the heading of Allocation, and in its opinion covering the denial of the Petition on pages 856–862, 93 F.Supp. The court cited and quoted from the controlling decisions in the Western Pacific, 318 U.S. 448, 63 S.Ct. 692, Milwaukee, 318 U.S. 523, 63 S.Ct. 727, Denver & Rio Grande (Reconstruction Finance Corp. v. Denver & R. G. W. R. Co.), 328 U.S. 495, 66 S.Ct. 1282, 1384, 90 L.Ed. 1400, and other cases, and stated the law applicable to the allocations. It set out the facts concerning the valuation of $83,700,000 attributed to the New Orleans and the kinds and amounts of the allocations provided in respect of it in the plan and considered contentions to the effect that the treatment accorded to those interested in the stock discriminated unfairly against them. It concluded that the allegations of unfair discrimination were without merit, that "The Commission's allocation has given the Secured Serials full compensatory treatment", and that "in view of N.O.T.M.'s contribution of earning power the court finds that [the allocation] is in all respects fair and equitable".

 The record is in accord with these findings. The value of the New Orleans is not mathematically demonstrable · but the record shows that the Commission accorded it expert appraisal that took all the relevant elements into account. There was no belittling of it or discrimination against it. The following declaration made by the Commission accords with the evidence: "For reasons previously stated by us, we conclude that the securities allocated to the New Orleans and in consequence thereof to the 5¼ percent Secured Serial bondholders fairly represent the earnings value of the New Orleans. In our opinion we have accorded to them the full equitable equivalent of the value of their stock and any further allocation will be unjustly at the expense of the creditors of the other debtors (and the preferred stockholders of the Missouri Pacific), either by dilution of the new securities if we increase the system capitalization or by a decrease in the amount of securities available for distribution to the other creditors and stockholders if we maintain the maximum capitalization of the system which we have found proper. Either alternative would be unjustified." Full credit was given for betterments and for the increase of population, enterprise and railroad shipments in New Orleans territory, past and to be anticipated. Its valuation was increased 25 percent over that fixed in the 1940 and the 1944 plan; the shares of its publicly held stock were allotted $175 face value of new System securities, notwithstanding at the hearing it was shown that the market quotations on the stock ranged from 87 to 110 in the years 1947 and 1948, and that on March 9, 1950, the market quotations were 90 bid and 100 asked. The market value of the new securities issuable in respect of the New Orleans capitalization is 18.48% of the aggregate market value of all the new System securities as of July 25, 1950, which is as high a percentage as could fairly be claimed for the New Orleans share.

But the controlling consideration in this court is that the Commission in conformity with legal standards found that the allocation in respect of N.O.T.M. stock was compensatory and fair and equitable and the fully informed District Court concurred in and approved that finding. It must be sustained.

Similarly as to the finding of no equity in the Missouri Pacific common stock, it is based on credible evidence and was properly approved by the District Court.

 The allocation of $30,000,000 of the capitalization of the new System to the holders of preferred stock of Missouri Pacific was also properly approved.

### (4) Miscellaneous Objections.

Under this heading of its main opinion the trial court discussed and declared its decision upon: (1) the question of the effective date of the Plan designated by the Commission as January 1, 1948, and possible changes in values occurring since the effective date; (2) its rulings excluding offers of testimony made at the hearing on the Plan; (3) a controversy concerning 60 shares of the N.O.T.M. stock originally collateral to the Serial bonds; (4) the amount and character of the inter-company debt due from New Orleans to Missouri Pacific; (5) the use of the available cash under the Plan, and (6) the provision of the Plan for the selection of the Board of Directors and the Reorganization managers. Upon our review of these matters:

(1) We find no error in the approval of the Commission's action fixing the effective date of the Plan and in establishing the rights of the parties in relation to that date. There have been no subsequent changes which justify alteration of the Plan.

(2) The record shows that at the hearing on the Plan the court excluded certain testimony and the exhibits offered in support thereof, and after the hearing it received and considered briefs from the parties. It explained the exclusion of the testimony and the exhibits and the relation of such action to the anticipated filing of briefs in its opinion at page 853 of 93 F.Supp. Complaint against the rulings is made on these appeals but we think it is without merit and that there was no prejudicial error in the rulings on the proffers of testimony and exhibits. No newly discovered or material facts were excluded but the record before Judge Moore in this reorganization, like the record before him in Brooks v. St.

Louis-San Francisco Ry. Co., 8 Cir., 153 F.2d 312, loc. cit. 317 showed, as he there stated it, that "The Commission has * * gone exhaustively into the history of the debtor corporation, including the development of its physical and financial structure and that of its subsidiaries; into the characteristics of its properties and their condition and improvements; into the traffic experience, year by year, by commodities and revenue tons carried, and by flow of traffic over various parts of the System, and by the prospect for the future; into operating revenues for each year since 1915 by classes and compared by ratios to the total in the preceding year; into expenses and operating ratios since 1915, both maintenance and improvement, and into taxation; into the net earnings available for interest since the debtor has been in existence; and elaborately into the elements of physical value."

 There were data enough in the file of the Commission to afford bases for innumerable studies on valuation. By the rulings complained of the court merely excluded additional oral testimony and exhibits concerning records and statistics already received. The proponents of the testimony were not precluded from presenting the substance of their proffers in the briefs which were to be and were filed after the hearing and we find no prejudice to any party by reason of the rulings at the hearing on the Plan. See Comstock v. Group of Institutional Investors, 335 U.S. 211, 227–228, 68 S.Ct. 1454, 92 L.Ed. 1911.

 (3) The finding and ruling of the District Court that redemption had been made of 60 shares of pledged New Orleans stock which through misadventure had not been returned to Missouri Pacific and that the holders of "the now outstanding Serial bonds should not as a matter of equity be entitled to regard these 60 shares as collateral for their bonds" is supported by evidence and is sustained.

 (4) It was and is argued for the Serial bonds and the New Orleans stock that the approximately $20,000,000 debt of New Orleans to Missouri Pacific ad-

judicated in Comstock v. Group of Institutional Investors, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911, ought to be scaled down about $1,300,000 by applying lower rates of interest than those called for in the promissory notes and the accounts stated, but there was no error in the holding of the Commission approved by the District Court that the agreed rates of interest at the time the debt was incurred were reasonable and are binding on the New Orleans. We find no error in its conclusion that both the principal amount of the debt and the fairness of the rate of interest were established in the Comstock case.

■ (5) The trial court found that proper provision is made in the Plan for the use of the available cash and we find no error in that conclusion. Though the amount of such cash somewhat exceeds the $50,000,000 under consideration by this court in Brooks v. St. Louis-San Francisco Ry. Co., supra, what was said there is applicable here, 153 F.2d at page 318: "These so-called funds on hand belonged to the Railway Company and while they may tend to enhance somewhat the value of the new stock and bonds, these stocks and bonds are held by those who have preferred claims and if the funds could be taken from the company for the purpose of paying debts they should be applied upon the remaining unsatisfied preferred claims of the bondholders, so that no possible benefit could inure to the stockholders or unsecured creditors." Some of the large amounts of cash accruing from the operations under the direction of the court have been applied from time to time pursuant to orders of the court, and some remain for disposition under the Plan. The appeals have not pointed out any error of action or inaction of the court in respect to the cash that merits discussion.

(6) The matter of representation allowed by the Plan in the selection of the Board of Directors and the Reorganization Managers has been extensively argued before the trial court and on these appeals. It is contended that if the Commission was in error in this matter and if the trial court erred in approving its action, this court may order the plan to be changed or corrected in respect of such error without sending it back to the Commission. We do not pass on that question.

■ The Commission in the discharge of its duties in the reorganization of many railroads and particularly the Missouri Pacific, has experience in the matter of starting the new companies off when reorganized. Its report shows that it gave careful consideration to the selection of the managers and directors here. The periods for which the officers of the new company are to function are very short in the life expectancy of the new company. Soon its stockholders will have the right to take over. Every selection of temporary manager and director must have the approval of the court and we think that entails a proper and a sufficient duty to be performed by the court in respect to the future management. Its performance will undoubtedly be more effective to ensure good interim management than any attempt to refine upon the reasons for or to change the allocations of the powers of appointment made by the Commission. We find no error in the court's approval of the Commission's order as to the selection and term of service of managers and directors.

The record shows that in carrying these reorganization proceedings through to final approval of the Plan the Commission and the District Court have had the benefit of and have conformed to controlling decisions of the Supreme Court which were waited for and were handed down during the course of the proceedings. Ecker v. Western Pacific R. Corp., 318 U.S. 448, 63 S.Ct. 692, 87 L.Ed. 892 and Group of Institutional Investors v. Chicago, M., St. P. & P. R. Co., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959, determined important questions relevant to railroad reorganization, and this court discussed and applied the decisions to such reorganizations in St. Louis-San Francisco Ry. Co. v. Chase National Bank, 8 Cir., 153 F.2d 319, and St. Louis Southwestern Ry. Co. v. Henwood, 8 Cir., 157 F.2d 337 on appeal from judgments entered by Judge Moore.

In so far as the issues argued here are fact issues the findings are supported by evidence which the experienced trial court could and did appraise with complete understanding. We hold that the approval by the court of the Plan reported by the Commission was without error and accordingly affirm Order No. 3571; Order No. 3661; and Order No. 3662 appealed from.

Affirmed.