15984

SEABOARD AIR LINE R. CO. v. DANIEL, ATTORNEY GENERAL, *ET AL.*

(43 S. E. (2d) 839)

*Messrs. J. B. S. Lyles,* of Columbia, and *W. R. C. Cocke* and *Norman S. Elliott,* of Norfolk, Va., for Plaintiff,

*Messrs. John M. Daniel,* Attorney General, and *M. J. Hough,* and *T. C. Callison,* Assistant Attorneys General, of Columbia, for Defendants,

*Messrs. J. B. S. Lyles,* of Columbia, and *W. R. C. Cocke* and *Norman S. Elliott,* of Norfolk, Va., for plaintiff, on re-argument,

*Messrs. John M. Daniel,* Attorney General, and *M. J. Hough* and *T. C. Callison,* Assistant Attorneys General, of Columbia, for Defendants, on re-argument,

August 29, 1947.

FISHBURNE, J.: On June 28, 1946, the Interstate Commerce Commission, acting under the authority purportedly

conferred upon it by Section 5 of the Interstate Commerce Act, 49 U. S. C. A., § 5, issued its report and order upon the application of the Seaboard Air Line Railroad Company, hereinafter referred to as the new company, authorizing it to purchase and reorganize the Seaboard Air Line Railway Company, sometimes referred to as the old company, which had been in receivership since 1930. The Commission further ordered that the Seaboard Air Line Railroad Company, a Virginia corporation, could operate its railroad lines and other properties in South Carolina without complying with Section 8 of Article IX of the state Constitution and with Sections 7777 through 7779 of the Code, which prohibit a foreign corporation from acquiring or operating a railroad in this state without first incorporating and obtaining a charter.

It was affirmatively ordered that the delay and expense which would be incurred, should the reorganized railroad company undertake to comply with the Constitution and statutes of South Carolina as to incorporation, would not accord with the national transportation policy, would burden interstate commerce, and would not be consistent with the public interests.

Shortly after the filing of the Commission's order, this action was brought by the plaintiff in the original jurisdiction of this court, by permission duly granted, praying three distinct forms of relief:

(1) A declaratory judgment adjudging that plaintiff is entitled to operate its railroad lines through South Carolina without complying with the constitutional provisions and the applicable statutory laws of the state;

(2) For an order of mandamus directed to the secretary of state requiring him to accept and file certain documents tendered by the plaintiff under the general corporation law covered by Sections 7765 and 7766 of the Code, which authorize a foreign corporation, other than a railroad company, to do business in South Carolina;

(3) An injunction against the attorney general restraining him from enforcing or attempting to enforce the provisions of Section 7784 or Section 7789 of the Code under which sections a railroad company is penalized for its failure to comply with the constitution and the laws of the state relating to incorporation.

In the order allowing the institution of this action in the original jurisdiction of the court, the attorney general was restrained, pending the further order of the court, from enforcing or attempting to enforce the penalty provisions of the Code above referred to, applicable when a railroad company fails to comply with those sections relative to obtaining a charter in this state.

The defendants, who are constitutional officers of the state of South Carolina, assail the order of the Interstate Commerce Commission as transcending the power granted to the Commission by the Congress under the Interstate Commerce Act. They filed an answer and return raising this issue, and the plaintiff filed a demurrer to the answer. The case now comes before us on issues raised by the pleadings.

The major issue presented is whether the report and order of the Interstate Commerce Commission is valid and effective under Section 5 of the Interstate Commerce Act to relieve the plaintiff from compliance with the constitutional and statutory provisions of South Carolina which prohibit a foreign railroad company from acquiring and operating a railroad in this state without first obtaining a charter. And, further, did the Interstate Commerce Commission go beyond its jurisdiction and into a field into which it was not directed by the Act of Congress, in undertaking to say in what state a railroad corporation should be chartered, and in what state it should not be chartered, regardless of the constitution and statutes of any particular state? There are subsidiary questions, but a determination of the main issue will dispose of the case.

The plaintiff, under the order of the Interstate Commerce Commission, is the successor in ownership and operation of

the properties of the old company which constitute an extensive railroad system, comprising approximately 4,200 miles of railroad lines within and through the states of Virginia, North Carolina, South Carolina, Georgia, Florida and Alabama. Plaintiff acquired these railroad lines pursuant to the plan of reorganization approved by the Commission, and since such acquisition has been operating them as a common carrier of freight and passengers by railroad.

Included in such properties now owned and operated by the plaintiff are 736 miles of railroad located within and through thirty counties of the state of South Carolina, which embrace several of its main trunk lines. In addition, plaintiff owns over 600 miscellaneous separate tracts of real estate situated in the state of South Carolina which are appurtenant to and used or useful in connection with the operation of its system of railroads.

As stated, the plaintiff is a corporation of Virginia. It appears from the record that the states of North Carolina, Georgia, Alabama, and Florida, do not require foreign railroad companies to incorporate. Railroad companies operate within their boundaries as foreign corporations, but are not compelled to obtain a charter therein. The plaintiff knew when it applied to the Interstate Commerce Commission under the plan of reorganization to purchase and operate the railroad system of the old company through South Carolina and the other named states, that it would be required to become a corporation of South Carolina under the constitution and laws of this state. Notwithstanding this, plaintiff made its application to the Commission alleging that it was advised that it would have power to acquire and operate the railroad system of the old company in South Carolina irrespective of the constitutional and statutory requirements—if such acquisition and operation should be authorized by the Interstate Commerce Commission.

The following statement is found in the report and order of the Interstate Commerce Commission:

"It would clearly be an unnecessary and undue burden on interstate commerce for the new company to be subjected to continuing expenses of over $300,000.00 a year to maintain a separate corporation to own and operate the railroad in South Carolina. It is not so clear, however, that the cost of organizing a corporation under the laws of South Carolina to acquire the properties in that state and thereafter consolidate the South Carolina corporation with the Virginia corporation, viz, $71,800.00, or the cost of maintaining the consolidated corporation as a South Carolina corporation, viz., $1,000.00 a year, would be unduly burdensome. Organization of a South Carolina corporation, and consolidation with the Virginia corporation, however, would cause substantial delay and needless expense."

The Commission went on to find:

"The provisions of Section 5 were further amended by the Transportation Act of 1940 which contains a declaration of the national transportation policy. The provisions as to relief from restraints, limitations and prohibitions of state law which would stand in the way of execution of the policy of Congress were clarified and strengthened. In administering the provisions of Section 5 and other provisions of the Act we must do so with a view to carrying out the declared policy of Congress, including the promotion of economical and efficient service and the fostering of sound economic conditions in transportation. Corporate simplification wherever possible is in accord with this policy. Furthermore, a termination of a longstanding receivership of railroad properties is always a matter of substantial public interest. The delays that would result and the needless expense that would be incurred should the new company undertake to comply with the constitution and statutes of South Carolina requiring the creation of a separate corporation to acquire, or to acquire and operate, the railroad which the new company proposes to acquire and operate in that state would not accord with the national transportation policy and would not be consistent with the public interest."

It is conceded that this court has jurisdiction to determine whether the order of the Commission was a valid or invalid exercise of power under Section 5 of the Interstate Commerce Act.

The supremacy of congressional legislation over the entire subject of interstate commerce and its instrumentalities has been upheld in numerous cases. Among them may be cited the following: *Houston E. & W. T. R. Co. v. United States,* 234 U. S. 342, 34 S. Ct. 833, 58 L. Ed. 1341; *Alabama & V. R. Co. v. Jackson & E. R. Co.,* 271 U. S. 244, 46 S. Ct. 535, 70 L. Ed. 928; *State of Texas v. United States,* 292 U. S. 522, 54 S. Ct. 819, 78 L. Ed. 1402; *Morgan v. Commonwealth of Virginia,* 328 U. S. 373, 66 S. Ct. 1050, 90 L. Ed. 1317, 165 A. L. R. 574.

The defendants raise no question as to the constitutional power of the Congress to confer authority upon the Commission to approve the purchase and reorganization of the old Seaboard Air Line Railway Company. The question here has to do simply with the scope of the authority which has been conferred.

The statutory provisions are found in Section 5 of the Interstate Commerce Act, Paragraph 11, and are as follows:

"The authority conferred by this section shall be exclusive and plenary, and any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall have full power (with the assent, in the case of a purchase and sale, a lease, a corporate consolidation, or a corporate merger, of a majority, unless a different vote is required under applicable State law, in which case the number so required shall assent, of the votes of the holders of the shares entitled to vote of the capital stock of such corporation at a regular meeting of such stockholders, the notice of such meeting to include such purpose, or at a special meeting thereof called for such purpose) to carry such transaction into effect and to own and

operate any properties and exercise any control or franchises acquired through said transaction without invoking any approval under State authority; and any carriers or other corporations, and their officers and employees and any other persons, participating in a transaction approved or authorized under the provisions of this section shall be and they are hereby relieved from the operation of the anti-trust laws and of all other restraints, limitations, and prohibitions of law, Federal, State, or municipal, insofar as may be necessary to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, maintain, and operate any properties and exercise any control or franchises acquired through such transaction. Nothing in this section shall be construed to create or provide for the creation, directly or indirectly, of a Federal corporation, but any power granted by this section to any carrier or other corporation shall be deemed to be in addition to and in modification of its powers under its corporate charter or under the laws of any State."

Under the foregoing provisions, any carrier or corporation participating in or resulting from any transaction approved by the Commission thereunder, shall be relieved from the operation of: (a) The anti-trust laws, and (b) all other restraints, limitations and prohibitions of laws, Federal, State or municipal *insofar as may be necessary* to enable them to carry into effect the transaction so approved or provided for in accordance with the terms and conditions, if any, imposed by the Commission, and to hold, manage, and operate any properties and exercise any control or franchise acquired through such transaction.

We think it clear from the whole quoted section that the prohibition against the creation, directly or indirectly, of a federal corporation likewise excluded any power to control, limit or prohibit incorporation under state laws. And it follows that no power was conferred upon the Commission to say in what state or states a railroad com-

pany may be incorporated or not incorporated. The Act says that any power granted to any carrier "shall be deemed to be in addition to and in modification of its powers under its corporate charter or under the laws of any State." The Commission has undertaken to say, in this transaction whereby the palintiff has acquired the properties of the old company, that the constitution and laws of South Carolina regarding incorporation may be overridden and disregarded when no such explicit authorization was granted by the Congress.

No case directly in point has been called to our attention. The case relied upon strongly by the plaintiff, which it is asserted most nearly approximates the facts in the instant case, is *State of Texas v. United States*, 292 U. S. 522, 54 S. Ct. 819, 78 L. Ed. 1402. In that case the court held that the Interstate Commerce Commission, in the exercise of the authority conferred upon it by Section 5 of the Interstate Commerce Act, as amended by the Emergency Railroad Transportation Act, 1933, was empowered to approve a lease of the property of one railroad company to another which permitted the lessee to abandon or to remove from the state of the lessor's incorporation the railroad shops and offices, where a marked saving would result from such abandonment or removal.

It was stated that this approval was authorized notwithstanding a statute of the state of Texas requiring the lessor to retain its general offices within the state, and forbidding it from changing the location of its general offices, machine shops, or round houses save with the consent and approval of the state railroad commission. In the *Texas case* the question was not involved as to whether or not a railroad company must obtain a charter from Texas to operate therein. The question as to what state or states should grant charters to the railroads operating in Texas was not raised. The Commission had to deal only with the physical operation of the railroad as such operation might relate to the best in-

terest of commerce and to insure adequate transportation service.

The Interstate Commerce Act not only fails to specifically grant authority to the Commission to deal with the matter of charters, but it may be inferred, as we have pointed out, from the language used that the purpose of congress was to prohibit the Commission from directly or indirectly determining what state or states a railroad company should be incorporated in.

Unquestionably, the Commission acted within the scope of its authority in passing upon and approving the details of the reorganization plan of the Seaboard Air Line Railway, its method of financing, and whether the reorganization plans were for the best interest of interstate commerce. But it is far from clear that the Act conferred upon it the power to discriminate, in effect, against any state or states by adjudging in what state a charter should be granted.

The plaintiff contends that to comply with the statutes of South Carolina and the constitutional provision requiring that railroads operating in this state should obtain a charter, would impose an undue burden on interstate commerce.

As shown by the report and order of the Commission, the cost incident to obtaining a South Carolina charter is negligible as compared with the millions of dollars in value of the physical properties and the millions of dollars of income owned and controlled by the plaintiff. It might be inconvenient or undesirable to obtain a South Carolina charter, but we do not see how such requirement would constitute a burden on interstate commerce.

Holding as we do that the Interstate Commerce Commission lacked the power under Section 5 of the Interstate Commerce Act to authorize the plaintiff to operate its railroad lines in this state without first obtaining a charter, it

necessarily follows that the complaint should be dismissed and the restraining order heretofore granted revoked.

It is so ordered.

BAKER, CJ., and STUKES, TAYLOR and OXNER, JJ., concur.