CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, Plaintiff-Appellant,

v.

TOLEDO, PEORIA & WESTERN RAILROAD COMPANY, J. Russel Coulter, R. M. Esslinger, D. L. Hughes and H. E. Kipling, Defendants-Appellees,

Robert J. Strand and Local Lodge 926, Brotherhood of Locomotive Firemen and Enginemen, Intervenors-Appellees,

Garland F. Brown, Sr., John W. Towles, and Local Lodge 1084 of the Brotherhood of Railroad Trainmen, Intervenors-Appellees.

No. 14166.

United States Court of Appeals Seventh Circuit.

Dec. 5, 1963.

Robert W. Russell, Chicago, Ill., Timothy W. Swain, Peoria, Ill., Jordan J. Hillman, Chicago, Ill., Mishael O. Gard, Peoria, Ill., James P. Daley, Chicago, Ill., for appellant.

John E. Cassidy, Sr., Peoria, Ill., Harold C. Heise, Cleveland, Ohio, Alex Elson, Chicago, Ill., Louis F. Knoblock, Peoria, Ill., Willard J. Lassers, Aaron S. Wolff, Elson, Lassers & Wolff, Chicago, Ill., Knoblock & Ott, Peoria, Ill., Heiss, Day & Bennett, Cleveland, Ohio, for appellees.

Before HASTINGS, Chief Judge, and DUFFY and KNOCH, Circuit Judges.

DUFFY, Circuit Judge.

Plaintiff, Chicago and North Western Railway Company (North Western) brought this action to enjoin Toledo, Peoria & Western Railroad Company et al. (TP&W), its officers, agents and employees, from interfering with and preventing plaintiff from operating its engines and cars, with its own crews, over a section of railroad track between Sommer, Illinois, and the industrial plant of Archer-Daniels-Midland (ADM).

Local Lodge No. 926, Brotherhood of Locomotive Firemen and Enginemen, and Local Lodge No. 1084, Brotherhood of Railroad Trainmen, and certain of their officers, were permitted by the District Court to intervene as parties to this suit.

The complaint alleges that plaintiff obtained the right under a 1957 joint-track agreement with TP&W to operate its engines and cars over tracks which permit it to serve ADM with its own crews and power. This agreement was executed July 27, 1957, and was approved by the Interstate Commerce Commission on October 28, 1958.

North Western's main line and TP&W's main line run parallel through Sommer, Illinois. TP&W has substantial real estate holdings lying northerly from Sommer closely adjacent to North Western's main line, and also southerly from Sommer closely adjacent to its own main line.

The 1957 agreement delimited a joint industrial area. Provision was made for the construction of an interchange track at Sommer connecting North Western's main line and the main line of TP&W. Provision was also made for the construction of an industry track into the area where ADM's plant is now located. About 5.9 miles of North Western's tracks extending northerly from Sommer, and approximately 4 miles of TP&W's track extending southerly from that point, together with certain industry tracks to be built, were designated in the agreement as joint-trackage.

The 1957 agreement gave TP&W the right to operate its engines and cars with its own crews over certain North Western tracks referred to in the agreement as the "North Western segment." It is the claim of North Western that it was given similar rights to operate its engines and cars with its own crews over tracks of TP&W referred to in the agreement as the "Toledo segment."

The locomotives, crews and cars of North Western have not, at any time, moved over the Toledo segment. The switching of cars to the Archer-Daniels-Midland plant commenced in March 1961. From that date to and including March 1962, North Western delivered to TP&W at Sommer, 160 cars which TP&W delivered to the ADM plant. During the same period, TP&W moved 152 cars from the ADM plant, delivering same to North Western at Sommer. TP&W received five dollars per car for the 312 cars thus handled.

On April 11, 1962, North Western, which had received cars moving in interstate commerce, attempted to make delivery of these cars to the ADM plant with its own engine and crew. TP&W, through its officers and agents, refused to permit North Western to operate on the Toledo segment. Such refusal was backed up with physical force including locked switches and the arrest of one of North Western's brakemen who had been sent ahead of the movement as flag protector.

Defendants admit that they refused to permit North Western to run its locomotives with North Western crews over the Toledo segment, but strenuously deny they interfered with interstate commerce, and assert that they stood ready to and did complete the movement of cars to the ADM plant.

On June 13, 1962, the District Court entered an order holding it had jurisdiction to hear and determine the case. Thereafter, the trial of the case was held. The District Court then concluded that its earlier determination as to jurisdiction was in error, and on February 28, 1963, filed an opinion and order holding that it did not have jurisdiction because there was no issue present in the case arising under any federal act regulating commerce.

The District Court relied upon Gully, State Tax Collector for Mississippi v. First National Bank in Meridian, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70, which emphasized that the federal right relied on for jurisdiction must be a paramount and not a collateral issue in the suit. The Court said in Gully, at 299 U.S. page 112, 57 S.Ct. page 97, 81 L.Ed. 70: "The right or immunity must be such that it will be supported if the Constitu-

tion or laws of the United States are given one construction or effect, and defeated if they receive another. * * * "

In State Automobile Insurance Association v. Parry, 8 Cir., 123 F.2d 243, the interpretation of an insurance policy indorsement was at issue. The Court there held that notwithstanding the particular endorsement was inserted to conform the policy to the requirements of the Motor Carrier Act and an order of the Interstate Commerce Commission, nevertheless federal jurisdiction did not exist.

In Association of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 450, 75 S.Ct. 489, 495, 99 L.Ed. 510, the Court said: "Almost without exception, decisions under the general statutory grants of jurisdiction * * * have tested jurisdiction in terms of the presence, as an integral part of plaintiff's cause of action, of an issue calling for interpretation or application of federal law. * * * "

North Western argues that the joint trackage agreement could not have been undertaken without the approval of the Interstate Commerce Commission; that approval of the ICC gave the agreement its vitality; that it follows plaintiff's claim relates to rights and obligations arising under the Interstate Commerce Act.

We hold that although it was necessary to obtain Interstate Commerce Commission approval of the 1957 agreement, this is not sufficient to confer jurisdiction upon the District Court. No mandatory order of the Interstate Commerce Commission is involved. We agree with the District Court that the Interstate Commerce Commission approval was permissive only. The fact that such permission was required, does not have the effect of making the commerce act a part of the contract insofar as the respective rights of North Western and TP&W are concerned.

There is no allegation in this complaint that there has been complaint from shippers, and it does affirmatively appear that ADM was satisfied with the service rendered by TP&W.

A prior decision of this Court (Toledo, P. & W. R. R. v. Brotherhood of Railroad Trainmen, etc., 7 Cir., 132 F.2d 265) has been discussed at some length by the parties to this suit. We there said, 132 F.2d at page 268: "The mere fact that Congress has paramount power to legislate in certain fields is not alone sufficient to confer jurisdiction. Thus the fact that a patent is involved will not result in federal jurisdiction if the real issue concerns merely title to the patent for that is not a matter arising under a federal law. * * * Similarly, if one of the parties is engaged in interstate commerce and subject to regulation under a federal statute, the court has no jurisdiction of matters concerned solely with a contract between the adverse parties. * * * To give rise to federal jurisdiction, the basis of the suit must be concerned with the validity, construction, enforcement or effect of the statute; anything less is insufficient. * * * "

Our decision in the case from which we have just quoted, was reversed by the Supreme Court in 321 U.S. 50, 64 S.Ct. 413, 88 L.Ed. 534. However, the issue of jurisdiction was not mentioned by that Court. The Supreme Court held TP&W was not entitled to injunctive relief because it had failed to comply with the arbitration provisions of the Railway Labor Act.

North Western points out that it made and filed tariffs with the Interstate Commerce Commission including service to the Archer-Daniels-Midland plant. We think this is of no significance on the question of jurisdiction. All the Interstate Commerce Commission did was to receive and file the tariffs without objection.

In determining the rights of the parties to this suit, it is not necessary to consider any part of the Interstate Commerce Act or any other federal statute, nor the Constitution of the United States. The Court which will pass on this question needs only to consider the two instruments that constitute the 1957 agreement.

The intervenors urge that assuming federal jurisdiction does exist, the Norris-LaGuardia Act withdraws jurisdiction to grant injunctive relief against the employees of TP&W. The District Court overruled this contention holding that, at most a conditional threat of a labor dispute lurks in the background of this litigation. We do not reach this point.

We have not discussed the operating agreement dated April 10, 1959 entered into by North Western and TP&W. It is, in effect, a part of the contract dated July 25, 1957.

We, like the District Court, point out that nothing stated in our opinion is intended to indicate our views as to the proper interpretation of the 1957 contract.

We hold the District Court was correct in dismissing the complaint for want of federal jurisdiction.

Affirmed.